EXHIBIT 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| Uniloc 2017 LLC | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| v. | § | Case No. 6:19-cv-532 |
| | § | |
| Apple Inc., | § | PATENT CASE |
| | § | |
| *Defendant* | § | Jury Trial Demanded |
| | § | |
| | § | |

## PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION
## TO DEFENDANT APPLE INC.

Pursuant to Federal Rules of Civil Procedure 34, Plaintiff Uniloc 2017 LLC ("Uniloc") directs the following requests for production of documents and electronically-stored information to Defendant Apple Inc. ("Apple" or "Defendant"). Plaintiff requests that these documents and electronically-stored information be produced to the offices of Davis Firm, P.C., 213 N. Fredonia St., Suite 230, Longview, Texas 75601 or at such other place as may be mutually agreed upon by counsel, within thirty (30) days after service of these document requests.

## I. DEFINITIONS

Unless specifically indicated, or otherwise required by the context in which the terms and names are used, the following instructions and definitions shall apply:

1.      "Apple," "Defendant," "You" and/or "Your" mean Apple Inc. and all related entities, predecessors, successors, subsidiaries, divisions, and/or affiliates thereof, and all past or present officers, directors, agents, employees, consultants, accountants, attorneys, representatives, and any other person or entity acting on behalf of any of the foregoing.

2.      "Uniloc" or "Plaintiff" means Plaintiff Uniloc 2017 LLC.

3.     "Accused Products" or "Accused Instrumentality" means each and every product or instrumentality identified in Plaintiff's Infringement Contentions and amendments and supplements thereto as well as all substantially similar products, and all associated computer hardware, software and digital content.   This definition includes, without limitation, Apple operating systems including macOS, iOS, iPadOS, tvOS, and watchOS versions subsequent to version 1.0 and associated servers implementing iOS/macOS/iPadOS/tvOS/watchOS update functionality, Mac desktop and notebook computers (MacBook, MacBook Pro, MacBook Air, iMac, iMac Pro, Mac Pro, Mac mini), iPad (iPad, iPad Air, iPad Pro, iPad mini), iPhone, Apple Watch, Apple TV, and iPod devices running said versions of macOS, iOS, iPadOS, tvOS, watchOS, the App Store (including Mac App Store, TV App Store, and Watch App Store) and associated servers implementing App Store functionality.

4.     "Accused Functionality" refers to the functionality illustrated by Uniloc 2017 LLC in its Infringement Contentions, amendments thereto, or subsequent notices and disclosures, and any reasonably similar functionality, that is incorporated into any of Your products and services.

5.     "Asserted Patent" refers to U.S. Patent No. 6,467,088, which may also be referred to herein and during the course of this Litigation as the "'088 Patent."

6.     "And" or "or" shall be both conjunctive and disjunctive.

7.     "Any" or "each" should be understood to include and encompass "all."

8.     "Communications" means any conveyance of information from one or more persons to one or more other persons and includes, but is not limited to, oral, written, electronic, verbal, and nonverbal modes.

9.     "Concerning" means relating to, referring to, describing, evidencing or constituting.

10.     "Document" and "Documents" shall have the broadest definition possible under Federal Rule of Civil Procedure 34 and Federal Rule of Evidence 1001, and shall include without limitation, any and all writings, communications, correspondence, emails, drawings, graphs, charts, recordings, photographs, and images.  The foregoing specifically includes information stored electronically, whether in a computer database or otherwise, regardless of whether such documents are presently in documentary form or not.

11.     "Electronically stored information" or "ESI" means any document that can be or has been stored in electronic form on a server, tape, electronic media such as an internal or external hard drive or any media whereby the document can be saved and be available for retrieval using any retrieval device, including a computer or server.

12.     "Entity" or "Entities" includes natural persons, proprietorships, partnerships, firms, corporations, public corporations, municipal corporations, governments (including foreign national governments, the government of the U.S. or any state or local government), all departments and agencies thereof, any governmental agencies of any country, political subdivisions, groups, associations, or organization.

13.     "Evidencing" means proving, indicating, or being probative of the existence or nature of the subject of the document requests.

14.     "Involving" is used in its broadest sense to mean without limitation including, employing, entailing, comprehending, and/or affecting.

15.     The "Lawsuit" or "Litigation" means the above-captioned lawsuit.

16.     "Person" means any natural person, legal entity, or business entity, including but not limited to any corporation, partnership, proprietorship, trust, association, organization or group of persons.

17.     Unless otherwise stated in a Request, "Relevant period" means the period from the date of first development of the Accused Instrumentalities through the present.

18.     "Relates," "relating," "refers to," or "regarding" means any relationship of whatever kind or nature, be it direct or indirect, and includes without limitation embodying, connected with, commenting upon, responding to, showing, describing, analyzing, reflecting, supporting and constituting.

19.     References to any natural person shall include, in addition to the natural person, any agent, employee, representative, attorney, superior, or principal thereof.

20.     References to any entity shall include, in addition to the entity, any officer, director, employee, partner, corporate parent, subsidiary, affiliate, agent, representative, attorney, or principal thereof.

21.     The use of the term "the" shall not be construed as limiting the request.

22.     Use of the singular shall also include the plural, and vice-versa.

23.     "Convoyed Products" means each and every product and/or service used, sold, offered for sale, or licensed in the United States by You that is intended to be used along with, in connection with, or related to the use of, any Accused Instrumentalities, Including product maintenance, training, service, and/or updates.

24.     "Source Code" means any set of instructions, directives, commands, abstractions, expressions, or representations capable of being interpreted, compiled, or executed by a computer, whether written in any command-line interface, compiled language, interpreted language, scripting language, data/query language, or markup language.

## II.  INSTRUCTIONS

1.      Documents shall be produced in accordance with Rule 34(b) of the Federal Rules of Civil Procedure.

2.      All requests pertain to the entirety of the relevant period and should be updated regularly.

3.      The documents sought include all responsive documents within Defendant's possession, custody, or control that are known to Defendant or that Defendant can locate or discover through reasonably diligent efforts.

4.      This request for documents and things is continuing consistent with the requirements of Rule 26(e) of the Federal Rules of Civil Procedure and the Local Rules of the Western District of Texas. In the event that any documents or things come into the possession or control of the defendant subsequent to the filing of the written response to this request, which documents or things fall within the scope of those requested but which were not included in the initial response, Plaintiff requests that it be notified of such documents or things, and that they be produced for inspection and copying, within seven (7) days after the receipt of such notice to Plaintiff.

5.      If Defendant objects to or otherwise refuses to produce documents in response to any portion of a document request, it shall (i) state the objection or reason for such refusal, and (ii) provide all documents called for by that portion of the document request to which it does not object or to which it does not decline to respond, as follows:

        a.      If Defendant objects to a document request on the grounds that it is too broad (i.e., that Defendant believes it calls for both documents which are relevant and are

not relevant to the subject matter of the action), Defendant shall respond to that document request by providing the documents which are relevant;

b.     If Defendant objects to a document request on the grounds that to provide responsive documents would constitute an undue burden, then Defendant shall provide as many of the requested documents as can be provided without undertaking an undue burden and discuss with Plaintiff's counsel possibilities for resolving any proclaimed undue burden; and

c.     If Defendant objects to any portion of a document request on the grounds that it is vague or indefinite, then Plaintiff asks Defendant's counsel to contact Plaintiff's counsel to obtain further clarification and within seven (7) days upon receiving clarification from Plaintiff's counsel, provide its response and documents. If Defendant remains uncertain after receiving clarification, Defendant shall set forth its understanding of the allegedly vague or indefinite term and shall then provide its response and documents as based upon Defendant's stated understanding.

6.     At least as early as the filing and service of the complaint in this case, Defendant was under a duty to preserve documents and ESI related to this matter. Accordingly, Plaintiff expects that Defendant and its counsel will prevent the destruction or alteration of any documents requested herein by the operation of any electronic information system (routine or otherwise) and hereby put Defendant on notice that any destruction or alteration of such documents, or any action that makes such documents more difficult or expensive to access and use, without completing a meet and confer process with Plaintiff's counsel regarding such action, will not be considered to be in "good faith," as contemplated in Fed. R. Civ. P. 37(f). If Defendant does not believe that it can reasonably comply with this instruction, Plaintiff requests that Defendant contact Plaintiff's

counsel, in writing, within 10 days from receipt of these Requests, to meet and confer about whether immediate Court intervention is necessary.

7.      Unless otherwise indicated, Plaintiff requests that Defendant produce responsive documents as follows:

      a.      Documents should be provided on DVD, CD, flash memory drive, external hard drive, or cloud-based drive (*e.g.,* DropBox). The volume of the documents will determine whether they are provided on DVD, CD, flash memory drive, external hard drive, or cloud-based drive.

      b.      Paper documents should be scanned and processed to TIFF files (with load files) or searchable PDF files. If a document is available to Defendant both in paper and electronic form, Plaintiff requests that Defendant produce the requested document in electronic form, as described herein.

      c.      All productions should be produced as they are ordinarily maintained, for example, organized by custodian or sources.

8.      If Defendant cannot respond or produce documents in response to any part of the following Requests in full, please respond to the extent possible, specifying the reason or reasons for Defendant's inability to respond or produce documents in response to the remainder of the Requests.

9.      If, to Defendant's knowledge, documents responsive to one or more requests were never in Defendant's possession, custody, or control but are or have been in the possession, custody, or control of any other person, please identify all such persons.

10.      If any responsive document was formerly in Defendant's possession, custody, or control but has been eliminated from Defendant's possession in any way, including, but not limited

to, having been lost, destroyed, transmitted, or discarded, please submit a written statement as follows:

      a.      The basis for withholding such document;

      b.      A generic description of the document being withheld;

      c.      The date the information contained in the document was learned or the document created;

      d.      The identity of the individual(s) who learned the information or authored the document;

      e.      The date the document was transmitted or otherwise made available to anyone; and

      f.      The specific Request(s) to which the withheld document relates.

11.    The scope of your search for ESI shall include all forms of ESI collection, preservation, transmission, communication and storage, including:

      a.      All ESI generated and maintained in the ordinary course of business, including ESI stored on mainframe computers or local and network computers or drives or servers or any other media or location where ESI can be or is stored;

      b.      Distributed data or removable data, i.e., information which resides on portable media and non-local drives, including home computers, laptop computers, magnetic or floppy discs, CD-ROMs, DVDs, Internet repositories including emailed host by Internet service providers, handheld storage devices such as tablets, PDAs, mobile/cell telephones, portable hard drives, and flash memory drives;

      c.      Forensic copy or backup ESI, including archive and backup data;

d.      Network ESI, including voice mail systems, email servers, ISP servers, network servers, cloud servers and fax servers;

e.      Legacy ESI, i.e., retained data that has been created or stored by the use of software or hardware that has been rendered outmoded or obsolete;

f.      Metadata, i.e., information regarding a particular data set which describes how, when and by whom it was collected, created, accessed and modified and how it is formatted.

12.     If Defendant objects to any of the definitions or instructions herein, please state such objection(s) in each response and indicate whether Defendant is complying with the definition or instruction in spite of the objection. If the objection goes to only part of a request, please produce all documents which do not fall within the scope of the objection.

13.     In accordance with Fed. R. Civ. P. 26(b)(5), if any information or document responsive to these requests is withheld pursuant to a claim of attorney-client privilege, work product protection, or any other common law or statutory privilege or protection, please specify the following:

a.      the basis for withholding such information or document;

b.      a generic description of the nature of the information or document being withheld in a manner that will enable Plaintiffs to assess the claim of privilege;

c.      the date the information was learned or the document created;

d.      the identity of the person(s) who learned the information or authored the document;

e.      the date the information or document was transmitted or otherwise made available to anyone; and

    f. the specific discovery request(s) to which the withheld information or document relates.

  14.  Unless otherwise indicated in writing, the failure to produce any documents in response to any request herein means that such documents do not exist, or are not in Defendant's possession, custody, or control, or the possession, custody, or control of Defendant's agents or anybody acting on Defendant's behalf.

# DOCUMENT REQUESTS

## REQUEST NO. 44:

All documents reflecting Your financial relationship, support, sponsorship, investment, partnership, patent-related activities (purchase, licensing, cross-licensing, sale, offer for sale, offer for purchase, transfer, acquisition, or assignment of patents), or ownership interest in, of, or with any entity (or its representatives or proxies) whose primary or sole business involves brokering patents, patent risk mitigation services, licensing patents and/or asserting patents through litigation (typically referred to as a patent licensing entity, non-practicing entity, patent aggregator, or patent-assertion entity, *e.g.,* Intellectual Ventures, Allied Security Trust ("AST"), Coller Capital, Rockstar Consortium f/k/a Rockstar Bidco, Cliff Island LLC, Digitude Innovations, and Goldpeak Innovations) (collectively, "Licensing Entities") and whom You had not sued or been sued for patent infringement during said relationship or activities.

Documents responsive to this Request include, without limitation, patent license agreements; patent licensing offers; patent purchase agreements; participation agreement for patent purchase; patent purchase offers; investment agreements in patent aggregator companies (AST and Intellectual Ventures); patent assignments; covenants not to sue; standstill agreements; settlement agreements; offers to purchase patents; investment or financing agreements; acquisition agreements; joint-venture agreements; patent or litigation assertion plans; lists of potential licensees; documents identifying or describing the patents that Apple purchased or licensed to or from the Licensing Entities; documents reflecting how much money Apple has paid or received to or from any Licensing Entities; any documents reflecting any Apple or third party assessment of the value of any of the foregoing documents, documents reflecting any advice or instructions that Apple has provided to any Licensing Entities relating to patent licensing or patent enforcement

activities; documents relating to Apple receiving assurances, covenants not-to-sue, standstill agreements, indemnification, or protection from being sued for patent infringement by any Licensing Entities; and presentations and correspondence related thereto that involve the Licensing Entities.

**REQUEST NO. 45:**

For each of the Accused Instrumentalities, documents sufficient to show Your U.S. and worldwide gross and net revenue and costs (including but not limited to costs of goods sold, material costs, operating costs, research & development costs, marketing costs, sales costs, royalty expenses) since 2007 (or, if later than 2007, since the date of first commercialization of each of the Accused Instrumentalities), on a monthly basis (or, only if not available on a monthly basis, per time period for which you keep such information in the ordinary court of Your business) and sufficient to show and describe the components and methodology that are used to calculate the revenue and costs.

To the extent that You produce responsive documents in the form of spreadsheets, please produce them in native file format (*e.g.,* Microsoft Excel format).

Documents responsive to this Request include, without limitation, spreadsheets and reports generated from Apple's accounting or financial reporting databases or systems showing the requested financial data and the components and methodology that are used to calculate the revenue and costs; internal and external presentations reflecting the requested financial data; and documents and data relied on by Apple's management when presenting App Store-related revenue during internal meetings, Top 100 executive retreats, and conferences (*e.g.,* WWDC), testimony by Apple employees, and documents, emails, and other evidence that Apple has produced to

Congress pertaining to the App Store (*e.g.,* July 29, 2020 Hearing on "Online Platforms and Market Power: Examining the Dominance of Amazon, Apple, Facebook, and Google" before the U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Antitrust, Commercial, and Administrative Law).

With respect to the App Store, sources of App Store-related revenue may be from any source (*e.g.,* end users, app developers, enterprise customers, advertisers, business units within Apple). The App Store-related revenue should include at least the following non-limiting examples:

a) App Store billings — Payments generated by paid downloads and in-app purchases (including subscriptions) of first-party and third-party apps via the App Stores such as, without limitation, Apple's commission from sales of paid apps, in-app purchases, and app subscriptions, and sales of Apple's apps sold through the App Stores (*e.g.,* Final Cut Pro, Aperture).

b) Advertising conducted by Apple or others through the App Stores from within apps or via the App Stores such as, without limitation, App Store Search Ads and iAd.

c) Business or professional services provided by Apple to enterprise customers wherein such services include the use of the App Stores or customized versions thereof such as, without limitation, Apple Business Manager, Apple Developer Program, and Developer Enterprise Program.

**REQUEST NO. 46:**

Documents sufficient to show Your methodology in determining the profitability of the Accused Instrumentalities and to show the U.S. and worldwide gross profits, operating profit, net income, gross profit margins, contribution margins, operating profit margins, net profit margins

since the date of first development of the Accused Instrumentalities, on a monthly basis (or, only if not available on a monthly basis, per time period for which you keep such information in the ordinary course of Your business), relating to each of the Accused Instrumentalities (both separately for each Accused Instrumentality and cumulatively for all such Accused Instrumentalities).

The relevant time period for this request is 2007 to present.

Documents responsive to this Request include, without limitation, spreadsheets and financial reports, presentations, slides, and summaries.

To the extent that You produce responsive documents in the form of spreadsheets, please produce them in native file format (*e.g.,* Microsoft Excel format).

**REQUEST NO. 47:**

All documents reflecting analysis, estimates, statements, and projections of or about cost savings or commercial benefits to Apple by offering and providing the App Store (including Mac App Store, TV App Store, and Watch App Store), the Accused Functionality, and/or the updating or reconfiguring of applications (including operating systems) via or by the Accused Instrumentalities. Commercial benefits may include, without limitation, increasing or maintaining revenue, profitability, and market share; reducing costs due to fewer Apple Store visits, the cost of an Apple Store or telephonic customer service inquiry compared to the cost of automatically pushing out a software update or patch; improving or maintaining customer acquisition, customer retention, or the "stickiness" of the Apple ecosystem[1]; estimated financial impact on Apple ecosystem and Your

---

[1] UNI-APPLE-00067363 at 364 ("tie all of our products together, so we further lock customers into our ecosystem"), 365 ("make Apple ecosystem even more sticky").

standing, reputation, and position in the market among Your competitors such as Google, Microsoft, Samsung, Huawei, Dell, HP, LG, and Android device manufacturers.

The relevant time period for this request is 2007 to present.

Documents responsive to this Request include, without limitation, presentations, slides, reports, summaries, spreadsheets, strategic plans, forecasts, projections, internal analyses, analyst and industry reports (*e.g.*, from Analysis Group, Comtech, Nielsen, NPD, comScore, Piper Jaffray, Gartner, Forrester Research, DC, Frost & Sullivan, etc.; Nielsen: Mobile Connected Device Report; Nielsen: Mobile Apps Playbook), white papers, testimony by Apple employees, and documents, emails, and other evidence that Apple has produced to Congress pertaining to the App Store (*e.g.,* July 29, 2020 Hearing on "Online Platforms and Market Power: Examining the Dominance of Amazon, Apple, Facebook, and Google" before the U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Antitrust, Commercial, and Administrative Law).

To the extent that You produce responsive documents in the form of spreadsheets, please produce them in native file format (*e.g.,* Microsoft Excel format).


**REQUEST NO. 48:**

All documents pertaining to the general operational and financial aspects of Apple Business Manager, Apple Developer Program, and Developer Enterprise Program, and any other business and professional services provided by Apple to enterprise customers wherein such services include the use of the App Store (including Mac App Store, TV App Store, and Watch App Store) or customized versions thereof, and the nature and extent to which the App Store or customized versions thereof are used, integrated, promoted, or marketed, or serve as a source of revenue or cost savings to Apple in relation to these services.

Documents responsive to this Request include, without limitation, presentations, slides, marketing materials, advertising, price quotes or estimates, reports, price lists, summaries, spreadsheets, strategic plans, financial statements, budgets, forecasts, projections, internal analyses, analyst reports, and industry reports concerning the subject of this document request.

**REQUEST NO. 49:**

All documents relating to any customer surveys, studies, analyses, or investigations (whether conducted by You, at Your direction, or accessed by You in the ordinary course of business) regarding the Accused Instrumentalities, App Store (including Mac App Store, TV App Store, and Watch App Store), Accused Functionality, the updating or reconfiguring of applications (including operating systems) via or by the Accused Instrumentalities, and regarding Apple's customer base preferences for the features and attributes of the foregoing that drives their decisions to purchase the Accused Instrumentalities.

The relevant time period for this request is 2007 to present.

Documents responsive to this Request include, without limitation, studies and surveys[2] (*e.g.,* App Store Survey; iPad Tracking Study; iPad Buyer Study; iPhone Buyer/Early Buyer Survey, *e.g.,* iPhone 3G Buyer Survey, iPhone 4S Early Buyer Survey; iPhone Owner study; iPhone Buyer Trending (US); iPod Buyer/Early Buyer Survey; Mac Buyer Tracking Study; and other similar studies and surveys related to the App Store, other Accused Instrumentalities, and Apps), surveys regarding how customer service regarding software updates or app updates can be

---

[2] Order re Discovery Motions, *Apple Inc., v. Samsung Electronics., Ltd., et al.,* Case No. 5:11-cv-01846-LHK, Dkt. 673 (N.D. Cal. Jan. 27, 2012), UNI-APPLE-00077883 at 903 ("Apple has agreed to produce final survey reports and raw survey data for all customer surveys related to iPhone, iPod Touch, iPad products, market research reports relating to those products, and a wide variety of print, television, and other advertisement media plans, as well as online click counts for the iPhone, iPod Touch, iPad products.").

improved, surveys regarding the importance of properly functioning and/or current apps in the App Store, raw survey data related to the foregoing surveys, documents reflecting the conclusions Apple has drawn from the survey data, market share and market research reports, analyst reports, competitive analysis, product comparisons, focus group results, questionnaires, reports (*e.g.,* Mobile Analytics Report, iPod Market Share and Wave 5 Customer Research Summary), business reviews (*e.g.,* Business Priorities Review), third-party surveys and industry reports (*e.g.,* from Analysis Group, Comtech, Nielsen, NPD, comScore, Piper Jaffray, Gartner, Forrester Research, DC, Frost & Sullivan, etc.; Nielsen: Mobile Connected Device Report; Nielsen: Mobile Apps Playbook), business plans, presentations, and executive meeting presentations and agendas (*e.g.,* annual Top 100 executive meeting), conference materials (*e.g.,* WWDC), slides, agendas, meeting minutes, videos, transcripts, summaries, speeches, testimony by Apple employees, and documents, emails, and other evidence that Apple has produced to Congress pertaining to the App Store (*e.g.,* July 29, 2020 Hearing on "Online Platforms and Market Power: Examining the Dominance of Amazon, Apple, Facebook, and Google" before the U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Antitrust, Commercial, and Administrative Law).

**REQUEST NO. 50:**

All documents reflecting, for each category of accused hardware device (*e.g.,* iPhone, iPad, iPod, Mac, Apple TV, Apple Watch), any or all of the following:

a) For each month (or, only if not available on a monthly basis, per time period for which you keep such information in the ordinary course of Your business), the number of downloads of applications (including operating system software) that have occurred, in the United

States and worldwide, via the App Store and, separately, that have occurred via other means such as the operating system of the Accused Instrumentalities;

b)  For each month (or, only if not available on a monthly basis, per time period for which you keep such information in the ordinary course of Your business), the number of updates of applications (including operating system software ) that have occurred, in the United States and worldwide, via the App Store and, separately, that have occurred via other means such as the operating system of the Accused Instrumentalities;

c)  For each time period reported for subparts a) and b) above, the number of devices in active use ("active installed base") for each category of accused hardware device in the United States and worldwide and, for each category of accused hardware device in the active installed base, how many devices are running on each version of the operating system for that device (*e.g.,* the number of iPhones running each of iOS version 1.x, 2.x, 3.x, etc.).

The relevant time period for this request is 2007 to present.

Documents responsive to this Request include, without limitation, spreadsheets, summaries, reports, and presentations reflecting the requested data; documents and data relied on by Apple's management when presenting App Store-related data and metrics: during internal meetings, on Apple's Developer Program website, Apple's press releases, at Top 100 executive retreats, conferences (*e.g.,* WWDC), testimony by Apple employees, and documents, emails, and other evidence that Apple has produced to Congress pertaining to the App Store (*e.g.,* July 29, 2020 Hearing on "Online Platforms and Market Power: Examining the Dominance of Amazon, Apple, Facebook, and Google" before the U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Antitrust, Commercial, and Administrative Law).

To the extent that You produce responsive documents in the form of spreadsheets, please produce them in native file format (*e.g.,* Microsoft Excel format).

**REQUEST NO. 51:**

All documents reflecting the full version history for each of the top 20 free iOS, macOS, tvOS, and watchOS apps and top 20 paid iOS, macOS, tvOS, and watchOS apps in each year since 2007.

Documents responsive to this Request include, without limitation, version history documents and records, spreadsheets, summaries, reports, and presentations reflecting the requested data; documents and data relied on by Apple's management when presenting app-related data and metrics during internal meetings, annual Top 100 executive retreats, and conferences (*e.g.,* WWDC).

To the extent that You produce responsive documents in the form of spreadsheets, please produce them in native file format (*e.g.,* Microsoft Excel format).

**REQUEST NO. 52:**

All documents relating to Apple's First Notice of Unmarked Patented Articles (and any subsequent notices, amendments, or supplements related thereto) and the products listed therein, including any and all documentary evidence that support, tends to support, refute, or tends to refute Apple's belief that the products listed in the Notice practice one or more claims of the '088 Patent.

Documents responsive to this Request include, without limitation, product guides, product and technical specifications, web pages, deposition and trial transcripts, articles, presentations, slides, reports, summaries, correspondence with third parties, and white papers.

**REQUEST NO. 53:**

All documents relating to each content delivery network ("CDN"), whether developed and provided by You or by third-parties, that You have used since 2007 to provide for the storage, distribution, and/or downloading of software (*e.g.,* apps, operating systems, updates thereto) pertaining to the App Store (including Mac App Store, TV App Store, and Watch App Store), the Accused Functionality, and/or the updating or reconfiguring of applications (including operating systems) via or by the Accused Instrumentalities.

Documents responsive to this Request include, without limitation, documents (*e.g.,* presentations, flow charts, logical and physical maps, reports, summaries, data flows, white papers, agreements, contracts, diagrams, specifications, spreadsheets) that describe, identify, or show the logical and physical location, architecture, and layout of each CDN and its servers, nodes, cache locations, and data centers; the processes, steps, and procedures used to provide the functions of storage, distribution, and/or downloading of software in each CDN; the flow of data relating to the storage, distribution, downloading, and sale (including in-app purchases) of software (*e.g.,* apps, operating systems, updates thereto) that is to, from, within, between, and among any and all CDNs and App Store-related servers in the United States and worldwide; Apple's agreements with each third-party CDN provider (*e.g.,* Akamai[3], Level 3, Limelight, etc.)[4]; revenue and costs related to each CDN; and the processes, data flow, and extent to which any CDN based in whole or in part in the United States is involved in the storage, distribution, and/or downloading of software (*e.g.,* apps, operating systems, updates thereto) pertaining to the App Store (including Mac App Store,

---

[3] Apple's agreements with Akamai were referenced as a trial exhibit in the *Smartflash v. Apple* (E.D. Tex.) case.
[4] "Apple's multi-terabit, $100M CDN is live—with paid connection to Comcast," July 31, 2014, at https://arstechnica.com/information-technology/2014/07/apples-multi-terabit-100m-cdn-is-live-with-paid-connection-to-comcast/ ("Apple is still using Akamai and Level 3 CDN services for iTunes and app downloads,").

TV App Store, and Watch App Store), the Accused Functionality, and/or the updating or reconfiguring of applications (including operating systems) via or by the Accused Instrumentalities.

## REQUEST NO. 54:

All documents pertaining to presentations given at Apple's annual "Top 100" executive meetings[5] since 2007.

Documents responsive to this Request include, without limitation, presentations, demonstrations, slides, agendas, minutes, videos, summaries, reports, and speeches pertaining to: the Accused Instrumentalities; the App Store (including Mac App Store[6], TV App Store, and Watch App Store); the Accused Functionality; the updating or reconfiguring of applications (including operating systems) via or by the Accused Instrumentalities; Apple's strategy[7] and roadmaps for the App Store and the other Accused Instrumentalities[8]; development of the App Store[9]; the commercial success of the App Store and the other Accused Instrumentalities; comparisons to or competitive analysis of competitors' products that compete against the Accused

---

[5] *See* Steve Jobs' 10/24/10 email regarding "Top 100" meeting agenda, at UNI-APPLE-00067363. *See also* https://www.businessinsider.com/email-reveals-steve-jobss-secret-plans-2014-4 "How Apple Works: Inside the World's Biggest Startup," May 9, 2011, Adam Lashinsky, at https://fortune.com/2011/05/09/inside-apple/ ("There is a small group at Apple that most certainly has met Steve Jobs. It's called the Top 100, and every year or so Jobs gathers these select few for an intense three-day strategy session at a proverbially secure, undisclosed location.
Everything about this Top 100 meeting is shrouded in secrecy, starting with its very existence. Those tapped to attend are encouraged not to put the meeting on their calendars. Discussing their participation is a no-no, even internally. . . The Top 100 meeting is an important managerial tool for Jobs. He and his chief lieutenants use it to inform a supremely influential group about where Apple is headed. The elaborately staged event also gives Jobs an opportunity to share his grand vision with Apple's next generation of leaders. The Top 100 meeting is part strategic offsite, part legacy-building exercise. Jobs generally kicks things off personally. Each session is as well crafted as the public product debuts for which the CEO is so famous. For presenters the career stakes are high, and the pressure is nerve-racking. . . . Jobs sometimes uses the occasion to unveil important initiatives."
[6] UNI-APPLE-00067363 at 366 ("Mac App Store").
[7] Order re Discovery Motions, *Apple Inc., v. Samsung Electronics., Ltd., et al.,* Case No. 5:11-cv-01846-LHK, Dkt. 673 (N.D. Cal. Jan. 27, 2012), UNI-APPLE-00077883 at 903 ("As to business plans and strategies, they are specifically requested in Samsung's RFP No. 55, and the court sees no reason why Apple should not produce them.").
[8] UNI-APPLE-00067363 at 364 ("2011 Product Roadmap"), 365 ("Strategy: catch up to Android where we are behind . . . and leapfrog them . . ."), 366 ("Strategy: Leap even further ahead of Google in discovery great new iOS apps").
[9] UNI-APPLE-00067363 at 366 ("Stores Update").

Instrumentalities[10]; apps and the App Store in relation to the "Post PC era" or the "Digital Hub" [11]; financial results, projections, forecasts, and estimates pertaining to the App Store and the other Accused Instrumentalities; volume of app downloads and app updates; stickiness of Apple's products ecosystem in relation to apps and the App Store[12]; importance of and customer demand and preference for features of the Accused Instrumentalities; and marketing and advertising of or via the App Store and Accused Instrumentalities.[13]

## REQUEST NO. 55:

All documents (including emails, technical documents, surveys and studies, business plans, roadmaps, forecasts, expert reports, exhibits, licenses, demonstratives, deposition or trial transcripts) regarding the Accused Instrumentalities, the App Store (including Mac App Store, TV App Store, and Watch App Store), the Accused Functionality, and/or the updating or reconfiguring of applications (including operating systems) via or by the Accused Instrumentalities, that You have produced in the following litigations: *Apple Inc., v. Samsung Electronics., Ltd., et al*., Case No. 5:11-cv-01846-LHK (N.D. Cal.), *Grace v. Apple Inc.*, Case No. 5:17-cv-00551-LHK (N.D. Cal.), *ContentGuard Holdings, Inc. v. Apple Inc*., Case No. 2:13-cv-01112-JRG (E.D. Tex.), and in the investigation and hearings on "Online Platforms and Market Power" by the Committee on the Judiciary, U.S. House of Representatives.

Documents responsive to this request include, but are not limited to, technical, flowchart and architecture documents (*e.g.,* Plaintiff's Exhibit Nos. 27.005, 27.007, 27.023, 27.032, 27.033,

---

[10] UNI-APPLE-00067363 at 364 ("business & competitive update"; "comparisons with Google, Samsung, HTC, Motorola & RIM").
[11] UNI-APPLE-00067363.
[12] UNI-APPLE-00067363 at 364 ("tie all of our products together, so we further lock customers into our ecosystem"), 365 ("make Apple ecosystem even more sticky").
[13] UNI-APPLE-00067363 at 366 ("iAds Update").

28.023, 171 from the *SmartFlash* case) relating to the accused functionality, system overview documents (*e.g.*, "2014-06-03 - Apple document titled 'Systems Overview,' Version 78, M. Amir," produced at APL-CG_00891549 - APL-CG_00891578. PX-1096, AX-1182, AX-1270 in the *ContentGuard* case), printed source code listed as exhibits in the *SmartFlash* and *ContentGuard* cases, deposition transcripts of Sean Kelly in the *SmartFlash* and *ContentGuard* cases, deposition transcript of Diedre Caldbeck in the *Grace* case, trial demonstratives from the *SmartFlash* and *ContentGuard* cases, studies and surveys[14] (*e.g.,* all surveys produced in the foregoing litigations[15] and investigation; App Store Survey; iPad Tracking Study; iPad Buyer Study; iPhone Buyer/Early Buyer Survey*, e.g.,* iPhone 3G Buyer Survey, iPhone 4S Early Buyer Survey; iPhone Owner study; iPhone Buyer Trending (US); iPod Buyer/Early Buyer Survey; Mac Buyer Tracking Study; and other similar studies and surveys related to the App Store, other Accused Instrumentalities, and Apps), surveys regarding how customer service regarding software updates or app updates can be improved, surveys regarding the importance of properly functioning and/or current apps in the App Store, raw survey data related to the foregoing surveys, documents reflecting the conclusions Apple has drawn from the survey data, market share and market research reports, analyst reports, competitive analysis, product comparisons, focus group results,

---

[14] Order re Discovery Motions, *Apple Inc., v. Samsung Electronics., Ltd., et al.,* Case No. 5:11-cv-01846-LHK, Dkt. 673 (N.D. Cal. Jan. 27, 2012), UNI-APPLE-00077883 at 903 ("Apple has agreed to produce final survey reports and raw survey data for all customer surveys related to iPhone, iPod Touch, iPad products, market research reports relating to those products, and a wide variety of print, television, and other advertisement media plans, as well as online click counts for the iPhone, iPod Touch, iPad products.").

[15] *E.g.,* PX-103.028; PX-57.010 ("App Store Survey, June 2012"); 103.001 ("iTunes Store Review"); 103.003 ("iTunes Store Tracker Survey"); 103.012 ("Mobile Analytics Report"); 103.013 ("Spreadsheet of questions and responses"); 103.029 ("iPhone 3G Buyer Survey"); 103.030 ("iPhone Buyer Trending (US)); 103.031 ("iPhone 4S Early Buyer Survey"); 103.032 ("Nielsen: Mobile Connected Device Report; April 29, 2011"); 103.033 ("Report: Mac Buyer Tracking Study, Q3 2010 Report, Apple Market Research & Analysis, 08/00/2010");
103.034 ("Report: Mac Buyer Tracking Study, FY 2010 Year End Report, Apple Market Research & Analysis, 12/00/2010"); 103.039 ("Report: iPad Tracking Study, FY11-Q2 Report, Apple Market Research & Analysis"); 103.043 ("Nielsen Report: Mobile Apps Playbook"); 103.044 ("App Store Survey"). Similar documents were produced in the ContentGuard case (and used at trial). *E.g.,* PX-1066 ("Compilation of Apple iTunes Surveys Presentations").

questionnaires, reports (*e.g.,* Mobile Analytics Report, iPod Market Share and Wave 5 Customer Research Summary), business reviews (*e.g.,* Business Priorities Review), third-party surveys and industry reports (*e.g.,* from Analysis Group, Comtech, Nielsen, NPD, comScore, Piper Jaffray, Gartner, Forrester Research, DC, Frost & Sullivan, etc.; Nielsen: Mobile Connected Device Report; Nielsen: Mobile Apps Playbook), business plans[16], roadmaps, forecasts, presentations, licenses[17], executive meeting presentations and agendas (e.g., annual Top 100 executive meeting), conference materials (*e.g.,* WWDC), slides, agendas, meeting minutes, videos, transcripts, summaries, speeches, testimony by Apple employees, and all documents (including those with Bates prefix HJC-APPLE) that Apple has produced[18] to Congress pertaining to the App Store (including, without limitation, Apple's business practices, market position, and relationship with app developers in relation to the App Store) arising from the investigation and July 29, 2020 Hearing on "Online Platforms and Market Power: Examining the Dominance of Amazon, Apple, Facebook, and Google" before the U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Antitrust, Commercial, and Administrative Law.


**REQUEST NO. 56:**

All documents reflecting Apple's belief and understanding regarding the degree of importance that the App Store (including Mac App Store, TV App Store, and Watch App Store),

---

[16] *E.g.*, Exhibit (PX-1064) a "Compilation of Apple Business Planning Documents" from the *ContentGuard* trial; "Report: Business Priorities Review" (PX-103.011) from the *SmartFlash* trial.

[17] *E.g.*, The Apple-Thomson license (*Smartflash* PX-74) and the Apple-Intertrust license (*ContentGuard* PX-1055).

[18] *See* Antitrust Subcommittee Chair Cicilline Statement for Hearing on "Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google," July 29, 2020, at https://judiciary.house.gov/news/documentsingle.aspx?DocumentID=3199 ("In September 2019, the Chairman and Ranking Members of the Full Committee and the Subcommittee issued sweeping, bipartisan requests for information to the four firms that will testify at today's hearing. Since then, we have received millions of pages of evidence from these firms, as well as documents and submissions from more than 100 market participants. We also conducted hundreds of hours of interviews.").

Accused Functionality, updating or reconfiguring of applications (including operating systems) via or by the Accused Instrumentalities, and being able to offer up-to-date and compatible apps to consumers, have:

    a)  To Apple, including, without limitation, to the Apple products ecosystem, to the sales and features set of the products or services offered by Apple, to Apple's standing in the markets in which the Accused Instrumentalities compete, to Apple's market position in the United States and worldwide with respect to its competitors (*e.g.,* Google, Microsoft, Samsung, Huawei, Dell, HP, LG, and Android device manufacturers, etc.) in the markets in the United States and worldwide in which they compete, and

    b)  to Apple's customers and their purchasing decisions about Apple's products and services.

The relevant time period for this request is 2007 to present.  If the beliefs as to the degree of importance have changed over this time period, please produce documents reflecting those changes in belief.

Documents responsive to this Request include, without limitation, studies and surveys[19] (*e.g.,* App Store Survey; iTunes Store Review; iTunes Store Tracker Survey; App Store Marketing Research; App Store Developers Profiling Research; US App Store Developers Profiling Research; App Store Developers Profiling Research: US; App Store Developer Study; iPad Tracking Study; iPad Buyer Study; iPhone Buyer/Early Buyer Survey, *e.g.,* iPhone 3G Buyer Survey, iPhone 4S Early Buyer Survey; iPhone Owner study; iPhone Buyer Trending (US); iPod Buyer/Early Buyer Survey; Mac Buyer Tracking Study; and other similar studies and surveys

---

[19] Order re Discovery Motions, *Apple Inc., v. Samsung Electronics., Ltd., et al*., Case No. 5:11-cv-01846-LHK, Dkt. 673 (N.D. Cal. Jan. 27, 2012), UNI-APPLE-00077883 at 903 ("Apple has agreed to produce final survey reports and raw survey data for all customer surveys related to iPhone, iPod Touch, iPad products, market research reports relating to those products, and a wide variety of print, television, and other advertisement media plans, as well as online click counts for the iPhone, iPod Touch, iPad products.").

related to the App Store, other Accused Instrumentalities, and Apps), raw survey data related to the foregoing surveys, documents reflecting the conclusions Apple has drawn from the survey data, market share and market research reports, competitive analysis, product comparisons, questionnaires, reports (*e.g.,* Mobile Analytics Report, iPod Market Share and Wave 5 Customer Research Summary), business reviews (*e.g.,* Business Priorities Review), third-party surveys and industry reports (*e.g.,* reports from Analysis Group, Comtech, Nielsen, NPD, comScore, Piper Jaffray, Gartner, Forrester Research, DC, Frost & Sullivan, etc.; Nielsen: Mobile Connected Device Report; Nielsen: Mobile Apps Playbook), business plans, presentations, and executive meeting presentations and agendas (e.g., annual Top 100 executive meeting), conference materials (*e.g.,* WWDC), slides, agendas, meeting minutes, videos, transcripts, summaries, speeches, testimony by Apple employees, and documents, emails, and other evidence that Apple has produced to Congress pertaining to the App Store (e.g., July 29, 2020 Hearing on "Online Platforms and Market Power: Examining the Dominance of Amazon, Apple, Facebook, and Google" before the U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Antitrust, Commercial, and Administrative Law).

DATED: August 4, 2020

Respectfully Submitted,

By: /s/ William E. Davis, III
William E. Davis, III
Texas State Bar No. 24047416
bdavis@bdavisfirm.com
Debra Coleman
Texas State Bar No. 24059595
dcoleman@bdavisfirm.com
Christian Hurt
Texas State Bar No. 24059987
churt@bdavisfirm.com

Edward Chin
Texas State Bar No. 50511688
echin@bdavisfirm.com
Ty Wilson
Texas State Bar No. 24106583
Twilson@davisfirm.com

**DAVIS FIRM, P.C.**
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
T: (903) 230-9090
F: (903) 230-9661

**Counsel for Plaintiff Uniloc 2017 LLC**

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing instrument was served via email to all counsel of record on August 4, 2020.

/s/ William E. Davis, III

William E. Davis, III