# EXHIBIT 10

**Analysis of Number of RFPs Served by Uniloc**

| Full Text of RFP | Text Broken into Subparts | Total No. Subparts |
|---|---|---|
| 1. All documents and things relating to Uniloc. | | 1 |
| 2. All documents and things relating to U.S. Patent No. 6,467,088, whether the Asserted Patent is referenced explicitly, in substance, by inference, or otherwise. | | 1 |
| 3. All documents and things relating to the design, development, research, testing, manufacture, or use of the Accused Instrumentalities anywhere in the world. | | 1 |
| 4. All documents and things that show how the functionality identified in Uniloc's infringement contentions, including the Accused Functionality, operates. | | 1 |
| 5. Documents and things sufficient to identify each of Your affiliates, parents, subsidiaries and/or other entities that are or were involved in designing, developing, researching, testing, manufacturing, or selling any Accused Instrumentality anywhere in the world. | | 1 |
| 6. Documents (including charts) sufficient to identify Your organization and reporting structure from the date of first development of the Accused Instrumentality to the present. | | 1 |
| 7. Documents sufficient to identify the name (including internal code or project names), model number, version number, first date of commercialization or availability for sale, and end of life date for every hardware product, software product, service, or platform that has ever embodied or implemented the Accused Instrumentalities or Accused Functionality. | | 1 |
| 8. All documents and things concerning any contracts, agreements, and terms and conditions between You and any third party that makes, uses, sells/licenses, offers to sell/license, or has permission to make, use, sell/license, or offer to sell the Accused Instrumentalities. | | 1 |

| | | |
|---|---|---|
| 9. All technical documents, schematics, plans, flow charts, process diagrams, specifications, data sheets, architecture and infrastructure documents, product requirement documents, reference guides, installation guides, user guides, overviews, white papers, or the like concerning the Accused Instrumentalities, Accused Functionality, and/or the updating or reconfiguring applications (including operating systems) via or by the Accused Instrumentalities. | | 1 |
| 10. All documents and things relating to any patented technology You contend is embodied in the Accused Instrumentalities or Accused Functionality. | | 1 |
| 11. All documents and things relating to the technical process of updating or reconfiguring applications (including operating systems) via or by the Accused Instrumentalities or Accused Functionality. | | 1 |
| 12. Source Code sufficient to show the structure, function, and operation of the Accused Instrumentalities and/or the Accused Functionality ("Source Code Material"). | | 1 |
| 13. All documents and things necessary to show the architecture and design of the Source Code Material, including but not limited to internal wiki's and blogs. | | 1 |
| 14. All version control or change logs for the Source Code Material. | | 1 |
| 15. All packaging, instructions, manuals, and promotional materials for the Accused Instrumentalities. | | 1 |
| 16. To the extent any Accused Instrumentalities are offered by You as software rather than hardware, documents sufficient to show the locations of any servers and/or computer utilized to deliver, transmit, or provide for access or downloading the Accused Instrumentalities or applications (including operating systems) to customers and/or end users. | | 1 |
| 17. All documents and things sufficient to identify and describe the functionality of the network architecture and | | 1 |

| | | |
|---|---|---|
| data flow pertaining to the Apple App Store, including the data flow between and among the servers (including but not limited to update servers, commerce servers, data servers) and networks (including but not limited to content delivery networks) related thereto. | | |
| 18. From the date of first commercialization of the Accused Instrumentality to the present, all documents and things concerning Your marketing and advertising of the Accused Instrumentalities or the Accused Functionality, including all documents, bids, requests for proposal, marketing studies, promotional material, press releases, articles, presentations, videos, web pages, blog posts, brochures, demos, tutorials, case studies, solution briefs, webinar materials, television advertisements, trade show (i.e., Worldwide Developers Conference) materials, magazine or trade journal advertisements, Internet advertising, and radio advertisements concerning said advertising and marketing. | | 1 |
| 19. All documents and things concerning your business, strategic, road maps, and marketing plans related to the Accused Instrumentalities, Accused Functionality, and/or the updating or reconfiguring applications (including operating systems) via or by the Accused Instrumentalities. | | 1 |
| 20. All training materials (including videos) provided to Your employees, contractors, representatives, app developers, distributors, partners, vendors, suppliers, customers, or retailers who have responsibilities concerning the sale and customer support (i.e., AppleCare, Genius Bar, Apple Geniuses) of the Accused Instrumentalities to the extent such training materials (including videos) relate to the sale, training, or customer support of or for the Accused Instrumentalities, the Accused Functionality, and/or the updating or reconfiguring applications (including operating systems) via or by the Accused Instrumentalities. | | 1 |

| | | |
|---|---|---|
| 21. All documents that have been made available, provided, or distributed to Your app developers (i.e., via Your app developer portals such as https://developer.apple.com and appstoreconnect.apple.com, partner portals, customer portals, distributor portals, or manufacturer portals) pertaining to the Accused Instrumentalities, the Accused Functionality, and/or the updating or reconfiguring applications (including operating systems) via or by the Accused Instrumentalities. | | 1 |
| 22. All documents pertaining to the use, design, development, performance, features, benefits, deployment, implementation, training, sale/license, and offer for sale/license of the Accused Instrumentalities or the Accused Functionality by Your channel partners, app developer partners, and technology partners. | <span style="color:green">Documents pertaining to design, development</span><br><br><span style="color:red">Documents pertaining to features, benefits</span><br><br><span style="color:blue">Documents pertaining to training</span><br><br><span style="color:purple">Documents pertaining to sale/license, and offer for sale/license</span> | 4 |
| 23. All documents and things concerning the commercial success, commercial performance, customer satisfaction, critiques, problems, shortcomings, challenges, technical success, technical performance, financial performance, financial impact, suitability, competitive position, and market position of the Accused Instrumentalities or products or services that compete with the Accused Instrumentalities, including but not limited to any correspondence or communication from customers regarding any product redesigns. | | 1 |
| 24. All documents and things concerning all actual or potential patent licenses (both inbound as licensee and outbound as licensor), technology license agreements, know-how license agreements, royalty agreements, settlement agreements, covenants not to sue, and the like to which You are a party or potential party and that concern or cover the Accused Instrumentality and/or Accused Functionality, including all communications, drafts, term sheets, | | 1 |

| | | |
|---|---|---|
| presentations, memoranda, and the like concerning or reflecting the negotiation of such licenses, agreements, and covenants and their rates or payment terms; how those rates or payment terms were determined; and any royalty reports or similar documents identifying the payments made or received under those licenses, agreements, and covenants. | | |
| 25. All documents that You or Your expert(s) consider relevant to (i) the analysis, calculation, or determination of damages (e.g., lump sum, reasonable royalty, royalty rate, running royalty) in this Lawsuit, and/or (ii) the analysis of any Georgia-Pacific factor. | | 1 |
| 26. All documents that You or Your expert(s) consider relevant to apportionment of damages in this Lawsuit. | | 1 |
| 27. All documents and things that You understand or believe to support Your contentions, if any, that the Asserted Patent is invalid under any section of Title 35 of the United States Code or any other legal basis, including without limitation unpatentability under Section 101, invalidity under Sections 102-103, invalidity for indefiniteness or for lack of written description or enablement or any other basis under Section 112. | | 1 |
| 28. All documents and things concerning any alleged prior art to any Asserted Patent, including but not limited to any communications between You and any third party regarding any alleged prior art to the Asserted Patent. | | 1 |
| 29. All documents and things concerning any purported non-infringing substitutes/alternatives to the inventions, methods, systems, computer-readable media, or apparatuses claimed in the Asserted Patent, including but not limited to the identification, availability, acceptability, and cost of using or implementing any such alternatives; the specific alterations that would be made to the Accused Instrumentalities to effectuate such alternatives; the steps, costs, and time required to develop and implement each alternative; and Your efforts, if any, to research or | | 1 |

| | | |
|---|---|---|
| implement any alleged non-infringing substitutes/alternatives. | | |
| 30. All documents and things that refer or relate to whether any Accused Instrumentality or any product or service that uses or results from any invention claimed, disclosed, described in the Asserted Patent: (i) satisfied one or more long-felt needs in the art; (ii) has enjoyed commercial success; (iii) has received industry acclaim or recognition; (iv) has been recognized for the significance of the contributions of the inventors of the Asserted Patent to the field of the Asserted Patent; (v) has had any person express initial skepticism about the inventions of the Asserted Patent; (vi) has had any person acknowledge the validity of the Asserted Patent; (vii) has been copied by others; (viii) has had any person incorporate the inventions of the Asserted Patent into any subsequent patent filing or device; (ix) has reflected, embodied, or been the subject of a long- felt need in the industry to obtain the inventions or claimed functionality described in the Asserted Patent; or (x) has reflected, embodied, or been the subject of any belief that a person has achieved commercial success using the inventions of the Asserted Patent. | | 1 |
| 31. All documents and things concerning the circumstances under which You first became aware of the existence of the Asserted Patent or patent application related thereto. | | 1 |
| 32. All documents and things relating to Your contention, if any, that You have not infringed the Asserted Patent. | | 1 |
| 33. All documents and things relating to Your contention, if any, that You have not willfully or deliberately infringed the Asserted Patent, including (without limitation) all documents and things relating to any and all efforts by You, upon becoming aware of the Asserted Patent, to investigate the scope of that Asserted Patent and to form a good-faith belief that the Asserted Patent was invalid, not infringed, or not enforceable. | | 1 |

| | | |
|---|---|---|
| 34. All documents and things relating to all written and oral communications exchanged between You and any attorney relating to the Asserted Patent, including (without limitation) all opinions and advice of counsel on which You intend to rely relating to the infringement, validity, unenforceability, or scope of the Asserted Patent. | | 1 |
| 35. All documents and things concerning any effort or analysis by You to design or redesign the Accused Instrumentalities so as to avoid infringement of any Asserted Patent, the costs of all design-around options analyzed, the time spent on such analysis, the estimated time to market for such a design-around, whether the design-around had or has any potential compatibility issues and, if so, the options analyzed to address those issues, whether the design-around had any impact (however measured) on the performance of the systems and services, the estimated costs that such a design would have added to any product or functionality, and the identities of all persons and entities responsible for or involved in the aforementioned activities. | | 1 |
| 36. All documents and things relating to Your decision, if any, to continue to develop, make, use, sell/license, import into the United States, or offer for sale/license the Accused Instrumentalities after becoming aware of the Asserted Patent. | | 1 |
| 37. All documents and things concerning any other patent infringement lawsuit or legal proceeding in which You have been a party relating to the Accused Functionality and/or the updating or reconfiguring applications (including operating systems), including but not limited to correspondence, pleadings, transcripts, depositions, discovery materials, and any settlement agreements entered into by the parties to such lawsuits. | | 1 |
| 38. All communications with any third party concerning this Lawsuit, and all documents and things produced or made | | 1 |

| | | |
|---|---|---|
| available to You by any third person or entity in connection with this lawsuit. | | |
| 39. All documents concerning the use, design, implementation, performance, benefits, advantages, and importance of updating or reconfiguring applications (including operating systems) in or relating to the Accused Instrumentality or Accused Functionality. | <span style="color:green">design, implementation relating to the Accused Instrumentality</span><br><br><span style="color:red">benefits and importance of updating or reconfiguring applications</span> | 2 |
| 40. All documents that describe or identify, in connection with the Accused Functionality, how applications (including operating systems) are updated or reconfigured. | | 1 |
| 41. All documents supporting or upon which you relied for your interrogatory responses in this Lawsuit. | | 1 |
| 42. For each person who is a deposition or trial witness or who has been disclosed in Your Initial Disclosures and amendments or supplements thereto in this Lawsuit, please produce:<br>    a. His or her most current resume or curriculum vitae;<br>    b. Prior deposition transcripts in any lawsuit pertaining to any Accused Instrumentality.<br>    c. Documents sufficient to show the nature, history, and extent of all prior, current, or anticipated financial, legal or business relationship or interest between You and each said person, including but not limited to documents pertaining to salary and bonus history; the amount and number of units or shares of stock and stock options sold, exercised, or held; contingency or commission payments and plans; and bonus or salary payments and plans; and<br>    d. All contracts, employment agreements, consulting agreements, patent licenses, patent assignments, settlement agreements, | | 1 |

| | | |
|---|---|---|
| confidentiality and non-disclosure agreements between You and each said person. | | |
| 43. To the extent not called for by any preceding paragraph, all other documents and things relating to Your claims and defenses in this Lawsuit. | | 1 |
| 44. All documents reflecting Your financial relationship, support, sponsorship, investment, partnership, patent-related activities (purchase, licensing, cross-licensing, sale, offer for sale, offer for purchase, transfer, acquisition, or assignment of patents), or ownership interest in, of, or with any entity (or its representatives or proxies) whose primary or sole business involves brokering patents, patent risk mitigation services, licensing  patents and/or asserting patents through litigation (typically referred to as a patent licensing entity, non-practicing entity, patent aggregator, or patent-assertion entity, e.g., Intellectual Ventures, Allied Security Trust ("AST"), Coller Capital, Rockstar Consortium f/k/a Rockstar Bidco, Cliff Island LLC, Digitude Innovations, and Goldpeak Innovations) (collectively, "Licensing Entities") and whom You had not sued or been sued for patent infringement during said relationship or activities.<br><br>Documents responsive to this Request include, without limitation, patent license agreements; patent licensing offers; patent purchase agreements; participation agreement for patent purchase; patent purchase offers; investment agreements in patent aggregator companies (AST and Intellectual Ventures); patent assignments; covenants not to sue; standstill agreements; settlement agreements; offers to purchase patents; investment or financing agreements; acquisition agreements; joint-venture agreements; patent or litigation assertion plans; lists of potential licensees; documents identifying or describing the patents that Apple purchased or licensed to | Docs reflecting financial relationship with patent risk mitigation services, non-practicing entities, or patent-assertion entities ("Licensing Entities")<br><br>lists of potential licensees;<br>any documents reflecting any Apple or third party assessment of the value of any of the foregoing documents;<br><br>Advice or instructions that Apple has provided to any Licensing Entities;<br><br>Assurances received by Apple from any Licensing Entities<br><br>presentations and correspondence related thereto that involve the Licensing Entities | 6 |

| | | |
|---|---|---|
| or from the Licensing Entities; documents reflecting how much money Apple has paid or received to or from any Licensing Entities; any documents reflecting any Apple or third party assessment of the value of any of the foregoing documents, documents reflecting any advice or instructions that Apple has provided to any Licensing Entities relating to patent licensing or patent enforcement activities; documents relating to Apple receiving assurances, covenants not-to-sue, standstill agreements, indemnification, or protection from being sued for patent infringement by any Licensing Entities; and presentations and correspondence related thereto that involve the Licensing Entities. | | |
| 45. For each of the Accused Instrumentalities, documents sufficient to show Your U.S. and worldwide gross and net revenue and costs (including but not limited to costs of goods sold, material costs, operating costs, research & development costs, marketing costs, sales costs, royalty expenses) since 2007 (or, if later than 2007, since the date of first commercialization of each of the Accused Instrumentalities), on a monthly basis (or, only if not available on a monthly basis, per time period for which you keep such information in the ordinary court of Your business) and sufficient to show and describe the components and methodology that are used to calculate the revenue and costs.<br><br>To the extent that You produce responsive documents in the form of spreadsheets, please produce them in native file format (e.g., Microsoft Excel format).<br><br>Documents responsive to this Request include, without limitation, spreadsheets and reports generated from Apple's accounting or financial reporting databases or systems showing the requested financial data and the components | Revenue and methodology used to calculate revenue<br><br>external presentations reflecting the requested financial data<br><br>documents and data relied on by Apple's management when presenting App Store-related revenue during internal meetings, Top 100 executive retreats, and conferences<br><br>testimony by Apple employees, and documents, emails, and other evidence that Apple has produced to Congress pertaining to the App Store | 4 |

and methodology that are used to calculate the revenue and costs; internal and external presentations reflecting the requested financial data; and documents and data relied on by Apple's management when presenting App Store-related revenue during internal meetings, Top 100 executive retreats, and conferences (e.g., WWDC), testimony by Apple employees, and documents, emails, and other evidence that Apple has produced to Congress pertaining to the App Store (e.g., July 29, 2020 Hearing on "Online Platforms and Market Power: Examining the Dominance of Amazon, Apple, Facebook, and Google" before the U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Antitrust, Commercial, and Administrative Law).

With respect to the App Store, sources of App Store-related revenue may be from any source (e.g., end users, app developers, enterprise customers, advertisers, business units within Apple).  The App Store-related revenue should include at least the following non-limiting examples:

    a.  App Store billings — Payments generated by paid downloads and in-app purchases (including subscriptions) of first-party and third-party apps via the App Stores such as, without limitation, Apple's commission from sales of paid apps, in-app purchases, and app subscriptions, and sales of Apple's apps sold through the App Stores (e.g., Final Cut Pro, Aperture).

    b.  Advertising conducted by Apple or others through the App Stores from within apps or via the App Stores such as, without limitation, App Store Search Ads and iAd.

| | | |
|---|---|---|
| c. Business or professional services provided by Apple to enterprise customers wherein such services include the use of the App Stores or customized versions thereof such as, without limitation, Apple Business Manager, Apple Developer Program, and Developer Enterprise Program. | | |
| 46. Documents sufficient to show Your methodology in determining the profitability of the Accused Instrumentalities and to show the U.S. and worldwide gross profits, operating profit, net income, gross profit margins, contribution margins, operating profit margins, net profit margins since the date of first development of the Accused Instrumentalities, on a monthly basis (or, only if not available on a monthly basis, per time period for which you keep such information in the ordinary course of Your business), relating to each of the Accused Instrumentalities (both separately for each Accused Instrumentality and cumulatively for all such Accused Instrumentalities).<br><br>The relevant time period for this request is 2007 to present<br><br>Documents responsive to this Request include, without limitation, spreadsheets and financial reports, presentations, slides, and summaries.<br><br>To the extent that You produce responsive documents in the form of spreadsheets, please produce them in native file format (e.g., Microsoft Excel format). | | 1 |
| 47. All documents reflecting analysis, estimates, statements, and projections of or about cost savings or commercial benefits to Apple by offering and providing the App Store (including Mac App Store, TV App Store, and Watch App Store), the Accused Functionality, and/or the updating or reconfiguring of applications (including operating systems) | <span style="color:red">Analysis of cost savings or commercial benefits to Apple, white papers, projections of cost savings or commercial benefits</span><br><span style="color:blue">Testimony by Apple employees, and documents, emails, and other evidence that Apple has produced to Congress pertaining to the App Store</span> | 2 |

via or by the Accused Instrumentalities. Commercial benefits may include, without limitation, increasing or maintaining revenue, profitability, and market share; reducing costs due to fewer Apple Store visits, the cost of an Apple Store or telephonic customer service inquiry compared to the cost of automatically pushing out a software update or patch; improving or maintaining customer acquisition, customer retention, or the "stickiness" of the Apple ecosystem[1]; estimated financial impact on Apple ecosystem and Your standing, reputation, and position in the market among Your competitors such as Google, Microsoft, Samsung, Huawei, Dell, HP, LG, and Android device manufacturers.

The relevant time period for this request is 2007 to present.

Documents responsive to this Request include, without limitation, presentations, slides, reports, summaries, spreadsheets, strategic plans, forecasts, projections, internal analyses, analyst and industry reports (e.g., from Analysis Group, Comtech, Nielsen, NPD, comScore, Piper Jaffray, Gartner, Forrester Research, DC, Frost & Sullivan, etc.; Nielsen: Mobile Connected Device Report; Nielsen: Mobile Apps Playbook), white papers, testimony by Apple employees, and documents, emails, and other evidence that Apple has produced to Congress pertaining to the App Store (e.g., July 29, 2020 Hearing on "Online Platforms and Market Power: Examining the Dominance of Amazon, Apple, Facebook, and Google" before the U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Antitrust, Commercial, and Administrative Law).

---

[1] UNI-APPLE-00067363 at 364 ("tie all of our products together, so we further lock customers into our ecosystem"), 365 ("make Apple ecosystem even more sticky").

| | | |
|---|---|---|
| To the extent that You produce responsive documents in the form of spreadsheets, please produce them in native file format (e.g., Microsoft Excel format). | | |
| 48. All documents pertaining to the general operational and financial aspects of Apple Business Manager, Apple Developer Program, and Developer Enterprise Program, and any other business and professional services provided by Apple to enterprise customers wherein such services include the use of the App Store (including Mac App Store, TV App Store, and Watch App Store) or customized versions thereof, and the nature and extent to which the App Store or customized versions thereof are used, integrated, promoted, or marketed, or serve as a source of revenue or cost savings to Apple in relation to these services.<br><br>Documents responsive to this Request include, without limitation, presentations, slides, marketing materials, advertising, price quotes or estimates, reports, price lists, summaries, spreadsheets, strategic plans, financial statements, budgets, forecasts, projections, internal analyses, analyst reports, and industry reports concerning the subject of this document request. | Operation and finances of Apple Business Manager<br><br>Operation and finances of Apple Developer Program<br><br>Operation and finances of Developer Enterprise Program<br><br>Nature and extent to which the App Store or customized versions thereof are used, integrated, promoted, or marketed, or serve as a source of revenue or cost savings to Apple in relation to these services | 4 |
| 49. All documents relating to any customer surveys, studies, analyses, or investigations (whether conducted by You, at Your direction, or accessed by You in the ordinary course of business) regarding the Accused Instrumentalities, App Store (including Mac App Store, TV App Store, and Watch App Store), Accused Functionality, the updating or reconfiguring of applications (including operating systems) via or by the Accused Instrumentalities, and regarding Apple's customer base preferences for the features and attributes of the foregoing that drives their decisions to purchase the Accused Instrumentalities.<br><br>The relevant time period for this request is 2007 to present. | Surveys, focus group results regarding the Accused Instrumentalities, market share and market research reports, analyst reports, competitive analysis, product comparisons, industry reports<br><br>conference materials (e.g., WWDC), slides, agendas, meeting minutes, videos, transcripts, summaries, speeches<br><br>testimony by Apple employees, and documents, emails, and other evidence that Apple has produced to Congress pertaining to the App Store | 3 |

Documents responsive to this Request include, without limitation, studies and surveys[2] (e.g., App Store Survey; iPad Tracking Study; iPad Buyer Study; iPhone Buyer/Early Buyer Survey, e.g., iPhone 3G Buyer Survey, iPhone 4S Early Buyer Survey; iPhone Owner study; iPhone Buyer Trending (US); iPod Buyer/Early Buyer Survey; Mac Buyer Tracking Study; and other similar studies and surveys related to the App Store, other Accused Instrumentalities, and Apps), surveys regarding how customer service regarding software updates or app updates can be improved, surveys regarding the importance of properly functioning and/or current apps in the App Store, raw survey data related to the foregoing surveys, documents reflecting the conclusions Apple has drawn from the survey data, market share and market research reports, analyst reports, competitive analysis, product comparisons, focus group results, questionnaires, reports (e.g., Mobile Analytics Report, iPod Market Share and Wave 5 Customer Research Summary), business reviews (e.g., Business Priorities Review), third-party surveys and industry reports (e.g., from Analysis Group, Comtech, Nielsen, NPD, comScore, Piper Jaffray, Gartner, Forrester Research, DC, Frost & Sullivan, etc.; Nielsen: Mobile Connected Device Report; Nielsen: Mobile Apps Playbook), business plans, presentations, and executive meeting presentations and agendas (e.g., annual Top 100 executive meeting), conference materials (e.g., WWDC), slides, agendas, meeting minutes, videos, transcripts, summaries, speeches, testimony by Apple employees, and documents, emails, and other evidence that Apple has

---

[2] Order re Discovery Motions, Apple Inc., v. Samsung Electronics., Ltd., et al., Case No. 5:11-cv-01846-LHK, Dkt. 673 (N.D. Cal. Jan. 27, 2012), UNI-APPLE-00077883 at 903 ("Apple has agreed to produce final survey reports and raw survey data for all customer surveys related to iPhone, iPod Touch, iPad products, market research reports relating to those products, and a wide variety of print, television, and other advertisement media plans, as well as online click counts for the iPhone, iPod Touch, iPad products.").

| | | |
|---|---|---|
| produced to Congress pertaining to the App Store (e.g., July 29, 2020 Hearing on "Online Platforms and Market Power: Examining the Dominance of Amazon, Apple, Facebook, and Google" before the U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Antitrust, Commercial, and Administrative Law). | | |
| 50. All documents reflecting, for each category of accused hardware device (e.g., iPhone, iPad, iPod, Mac, Apple TV, Apple Watch), any or all of the following:<br><br>a. For each month (or, only if not available on a monthly basis, per time period for which you keep such information in the ordinary course of Your business), the number of downloads of applications (including operating system software) that have occurred, in the United States and worldwide, via the App Store and, separately, that have occurred via other means such as the operating system of the Accused Instrumentalities;<br><br>b. For each month (or, only if not available on a monthly basis, per time period for which you keep such information in the ordinary course of Your business), the number of updates of applications (including operating system software ) that have occurred, in the United States and worldwide, via the App Store and, separately, that have occurred via other means such as the operating system of the Accused Instrumentalities;<br><br>c. For each time period reported for subparts a) and b) above, the number of devices in active use ("active installed base") for each category of accused hardware device in the United States and worldwide and, for each category of accused hardware device in the active installed | number of downloads of applications in the United States and worldwide<br><br>number of updates of applications in the United States and worldwide<br><br>number of devices in active use for each category above<br><br>Apple's Developer Program website<br><br>Apple's press releases<br><br>documents relied on by Apple's management when presenting at conferences; and<br><br>testimony and documents produced by Apple employees to Congress pertaining to the App Store | 7 |

| | | |
|---|---|---|
| base, how many devices are running on each version of the operating system for that device (e.g., the number of iPhones running each of iOS version 1.x, 2.x, 3.x, etc.). The relevant time period for this request is 2007 to present.<br><br>Documents responsive to this Request include, without limitation, spreadsheets, summaries, reports, and presentations reflecting the requested data; documents and data relied on by Apple's management when presenting App Store-related data and metrics: during internal meetings, on Apple's Developer Program website, Apple's press releases, at Top 100 executive retreats, conferences (e.g., WWDC), testimony by Apple employees, and documents, emails, and other evidence that Apple has produced to Congress pertaining to the App Store (e.g., July 29, 2020 Hearing on "Online Platforms and Market Power: Examining the Dominance of Amazon, Apple, Facebook, and Google" before the U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Antitrust, Commercial, and Administrative Law).<br><br>To the extent that You produce responsive documents in the form of spreadsheets, please produce them in native file format (*e.g.*, Microsoft Excel format). | | |
| 51. All documents reflecting the full version history for each of the top 20 free iOS, macOS, tvOS, and watchOS apps and top 20 paid iOS, macOS, tvOS, and watchOS apps in each year since 2007.<br><br>Documents responsive to this Request include, without limitation, version history documents and records, spreadsheets, summaries, reports, and presentations reflecting the requested data; documents and data relied on by Apple's management when presenting app-related | | 1 |

| | | |
|---|---|---|
| data and metrics during internal meetings, annual Top 100 executive retreats, and conferences (e.g., WWDC).<br><br>To the extent that You produce responsive documents in the form of spreadsheets, please produce them in native file format (e.g., Microsoft Excel format). | | |
| 52. All documents relating to Apple's First Notice of Unmarked Patented Articles (and any subsequent notices, amendments, or supplements related thereto) and the products listed therein, including any and all documentary evidence that support, tends to support, refute, or tends to refute Apple's belief that the products listed in the Notice practice one or more claims of the '088 Patent.<br><br>Documents responsive to this Request include, without limitation, product guides, product and technical specifications, web pages, deposition and trial transcripts, articles, presentations, slides, reports, summaries, correspondence with third parties, and white papers. | | 1 |
| 53. All documents relating to each content delivery network ("CDN"), whether developed and provided by You or by third-parties, that You have used since 2007 to provide for the storage, distribution, and/or downloading of software (e.g., apps, operating systems, updates thereto) pertaining to the App Store (including Mac App Store, TV App Store, and Watch App Store), the Accused Functionality, and/or the updating or reconfiguring of applications (including operating systems) via or by the Accused Instrumentalities.<br><br>Documents responsive to this Request include, without limitation, documents (e.g., presentations, flow charts, logical and physical maps, reports, summaries, data flows, white papers, agreements, contracts, diagrams, specifications, spreadsheets) that describe, identify, or show the logical and physical location, architecture, and | architecture and layout of each CDN and its servers, nodes, cache locations, and data centers;<br><br>physical location of each CDN developed and provided by Apple or third parties;<br><br>the processes, steps, and procedures used to provide the functions of storage, distribution, and/or downloading of software in each CDN;<br><br>the flow of data relating to the storage, distribution, downloading, and sale (including in-app purchases) of software (e.g., apps, operating systems, updates thereto) that is to, from, within, between, and among any and all CDNs and App Store-related servers in the United States and worldwide; | 6 |

| | | |
|---|---|---|
| layout of each CDN and its servers, nodes, cache locations, and data centers; the processes, steps, and procedures used to provide the functions of storage, distribution, and/or downloading of software in each CDN; the flow of data relating to the storage, distribution, downloading, and sale (including in-app purchases) of software (e.g., apps, operating systems, updates thereto) that is to, from, within, between, and among any and all CDNs and App Store-related servers in the United States and worldwide; Apple's agreements with each third-party CDN provider (e.g., Akamai[3], Level 3, Limelight, etc.)[4]; revenue and costs related to each CDN; and the processes, data flow, and extent to which any CDN based in whole or in part in the United States is involved in the storage, distribution, and/or downloading of software (e.g., apps, operating systems, updates thereto) pertaining to the App Store (including Mac App Store, TV App Store, and Watch App Store), the Accused Functionality, and/or the updating or reconfiguring of applications (including operating systems) via or by the Accused Instrumentalities. | Apple's agreements with each third-party CDN provider (e.g., Akamai, Level 3, Limelight, etc.); <br><br> revenue and costs related to each CDN | |
| 54. All documents pertaining to presentations given at Apple's annual "Top 100" executive meetings[5] since 2007. | | 1 |

---

[3] Apple's agreements with Akamai were referenced as a trial exhibit in the Smartflash v. Apple (E.D. Tex.) case.

[4] "Apple's multi-terabit, $100M CDN is live—with paid connection to Comcast," July 31, 2014, at https://arstechnica.com/information-technology/2014/07/apples-multi-terabit-100m-cdn-is-live-with-paid- connection-to-comcast/ ("Apple is still using Akamai and Level 3 CDN services for iTunes and app downloads,").

[5] See Steve Jobs' 10/24/10 email regarding "Top 100" meeting agenda, at UNI-APPLE-00067363.  See also https://www.businessinsider.com/email-reveals-steve-jobss-secret-plans-2014-4  "How Apple Works: Inside the World's Biggest Startup," May 9, 2011, Adam Lashinsky, at https://fortune.com/2011/05/09/inside-apple/ ("There is a small group at Apple that most certainly has met Steve Jobs. It's called the Top 100, and every year or so Jobs gathers these select few for an intense three-day strategy session at a proverbially secure, undisclosed location.

Everything about this Top 100 meeting is shrouded in secrecy, starting with its very existence. Those tapped to attend are encouraged not to put the meeting on their calendars. Discussing their participation is a no-no, even internally. . . The Top 100 meeting is an important managerial tool for Jobs. He and his chief lieutenants use it to inform a supremely influential group about where Apple is headed. The elaborately staged event also gives Jobs an opportunity to share his grand vision with Apple's next generation of leaders. The Top 100 meeting is part strategic offsite, part legacy- building exercise. Jobs generally kicks things off personally. Each session is as well crafted as the public product debuts for which the CEO is so famous. For presenters the career stakes are high, and the pressure is nerve-racking. .

. Jobs sometimes uses the occasion to unveil important initiatives."

| | | |
|---|---|---|
| Documents responsive to this Request include, without limitation, presentations, demonstrations, slides, agendas, minutes, videos, summaries, reports, and speeches pertaining to: the Accused Instrumentalities; the App Store (including Mac App Store[6], TV App Store, and Watch App Store); the Accused Functionality; the updating or reconfiguring of applications (including operating systems) via or by the Accused Instrumentalities; Apple's strategy[7] and roadmaps for the App Store and the other Accused Instrumentalities[8]; development of the App Store[9]; the commercial success of the App Store and the other Accused Instrumentalities; comparisons to or competitive analysis of competitors' products that compete against the Accused instrumentalities[10]; apps and the App Store in relation to the "Post PC era" or the "Digital Hub"[11]; financial results, projections, forecasts, and estimates pertaining to the App Store and the other Accused Instrumentalities; volume of app downloads and app updates; stickiness of Apple's products ecosystem in relation to apps and the App Store[12]; importance of and customer demand and preference for features of the Accused Instrumentalities; and marketing and advertising of or via the App Store and Accused Instrumentalities.[13] | | |

---

[6] UNI-APPLE-00067363 at 366 ("Mac App Store").

[7] Order re Discovery Motions, Apple Inc., v. Samsung Electronics., Ltd., et al., Case No. 5:11-cv-01846-LHK, Dkt. 673 (N.D. Cal. Jan. 27, 2012), UNI-APPLE-00077883 at 903 ("As to business plans and strategies, they are specifically requested in Samsung's RFP No. 55, and the court sees no reason why Apple should not produce them.").

[8] UNI-APPLE-00067363 at 364 ("2011 Product Roadmap"), 365 ("Strategy: catch up to Android where we are behind . . . and leapfrog them . . ."), 366 ("Strategy: Leap even further ahead of Google in discovery great new iOS apps").

[9] UNI-APPLE-00067363 at 366 ("Stores Update").

[10] UNI-APPLE-00067363 at 364 ("business & competitive update"; "comparisons with Google, Samsung, HTC, Motorola & RIM").

[11] UNI-APPLE-00067363.

[12] UNI-APPLE-00067363 at 364 ("tie all of our products together, so we further lock customers into our ecosystem"),

365 ("make Apple ecosystem even more sticky").

[13] UNI-APPLE-00067363 at 366 ("iAds Update").

| | | |
|---|---|---|
| 55. All documents (including emails, technical documents, surveys and studies, business plans, roadmaps, forecasts, expert reports, exhibits, licenses, demonstratives, deposition or trial transcripts) regarding the Accused Instrumentalities, the App Store (including Mac App Store, TV App Store, and Watch App Store), the Accused Functionality, and/or the updating or reconfiguring of applications (including operating systems) via or by the Accused Instrumentalities, that You have produced in the following litigations: Apple Inc., v. Samsung Electronics., Ltd., et al., Case No. 5:11-cv-01846-LHK (N.D. Cal.), Grace v. Apple Inc., Case No. 5:17-cv-00551-LHK (N.D. Cal.), ContentGuard Holdings, Inc. v. Apple Inc., Case No. 2:13-cv-01112-JRG (E.D. Tex.), and in the investigation and hearings on "Online Platforms and Market Power" by the Committee on the Judiciary, U.S. House of Representatives.<br><br>Documents responsive to this request include, but are not limited to, technical, flowchart and architecture documents (e.g., Plaintiff's Exhibit Nos. 27.005, 27.007, 27.023, 27.032, 27.033, 28.023, 171 from the SmartFlash case) relating to the accused functionality, system overview documents (e.g., "2014-06-03 - Apple document titled 'Systems Overview,' Version 78, M. Amir," produced at APL-CG_00891549 - APL-CG_00891578. PX-1096, AX-1182, AX-1270 in the ContentGuard case), printed source code listed as exhibits in the SmartFlash and ContentGuard cases, deposition transcripts of Sean Kelly in the SmartFlash and ContentGuard cases, deposition transcript of Diedre Caldbeck in the Grace case, trial demonstratives from the SmartFlash and ContentGuard cases, studies and surveys[14] (e.g., all surveys produced in the foregoing | Docs produced in *Apple Inc., v. Samsung Electronics., Ltd., et al.*, Case No. 5:11-cv-01846-LHK (N.D. Cal.),<br><br>Docs produced in *Grace v. Apple Inc.*, Case No. 5:17-cv-00551-LHK (N.D. Cal.),<br><br>Docs produced in *ContentGuard Holdings, Inc. v. Apple Inc.*, Case No. 2:13-cv-01112-JRG (E.D. Tex.)<br><br>Docs produced in *SmartFlash LLC et al. v. Apple Inc.*, Case No. 6:13-cv-447 (E.D. Tex.)<br><br>Docs produced in the investigation and hearings on "Online Platforms and Market Power" by the Committee on the Judiciary, U.S. House of Representatives | 5 |

---

[14] Order re Discovery Motions, Apple Inc., v. Samsung Electronics., Ltd., et al., Case No. 5:11-cv-01846-LHK, Dkt. 673 (N.D. Cal. Jan. 27, 2012), UNI-APPLE-00077883 at 903

| | | |
|---|---|---|
| litigations[15] and investigation; App Store Survey; iPad Tracking Study; iPad Buyer Study; iPhone Buyer/Early Buyer Survey, e.g., iPhone 3G Buyer Survey, iPhone 4S Early Buyer Survey; iPhone Owner study; iPhone Buyer Trending (US); iPod Buyer/Early Buyer Survey; Mac Buyer Tracking Study; and other similar studies and surveys related to the App Store, other Accused Instrumentalities, and Apps), surveys regarding how customer service regarding software updates or app updates can be improved, surveys regarding the importance of properly functioning and/or current apps in the App Store, raw survey data related to the foregoing surveys, documents reflecting the conclusions Apple has drawn from the survey data, market share and market research reports, analyst reports, competitive analysis, product comparisons, focus group results, questionnaires, reports (e.g., Mobile Analytics Report, iPod Market Share and Wave 5 Customer Research Summary), business reviews (e.g., Business Priorities Review), third-party surveys and industry reports (e.g., from Analysis Group, Comtech, Nielsen, NPD, comScore, Piper Jaffray, Gartner, Forrester Research, DC, Frost & Sullivan, etc.; Nielsen: Mobile Connected Device Report; Nielsen: Mobile Apps Playbook), business plans[16], roadmaps, forecasts, | | |

---

("Apple has agreed to produce final survey reports and raw survey data for all customer surveys related to iPhone, iPod Touch, iPad products, market research reports relating to those products, and a wide variety of print, television, and other advertisement media plans, as well as online click counts for the iPhone, iPod Touch, iPad products.").

[15] E.g., PX-103.028; PX-57.010 ("App Store Survey, June 2012"); 103.001 ("iTunes Store Review"); 103.003 ("iTunes Store Tracker Survey"); 103.012 ("Mobile Analytics Report"); 103.013 ("Spreadsheet of questions and responses"); 103.029 ("iPhone 3G Buyer Survey"); 103.030 ("iPhone Buyer Trending (US)"); 103.031 ("iPhone 4S Early Buyer Survey"); 103.032 ("Nielsen: Mobile Connected Device Report; April 29, 2011"); 103.033 ("Report: Mac Buyer Tracking Study, Q3 2010 Report, Apple Market Research & Analysis, 08/00/2010");

103.034 ("Report: Mac Buyer Tracking Study, FY 2010 Year End Report, Apple Market Research & Analysis, 12/00/2010"); 103.039 ("Report: iPad Tracking Study, FY11-Q2 Report, Apple Market Research & Analysis"); 103.043 ("Nielsen Report: Mobile Apps Playbook"); 103.044 ("App Store Survey"). Similar documents were produced in the ContentGuard case (and used at trial). E.g., PX-1066 ("Compilation of Apple iTunes Surveys Presentations").

[16] E.g., Exhibit (PX-1064) a "Compilation of Apple Business Planning Documents" from the ContentGuard trial; "Report: Business Priorities Review" (PX-103.011) from the SmartFlash trial.

| | | |
|---|---|---|
| presentations, licenses[17], executive meeting presentations and agendas (e.g., annual Top 100 executive meeting), conference materials (e.g., WWDC), slides, agendas, meeting minutes, videos, transcripts, summaries, speeches, testimony by Apple employees, and all documents (including those with Bates prefix HJC-APPLE) that Apple has produced[18] to Congress pertaining to the App Store (including, without limitation, Apple's business practices, market position, and relationship with app developers in relation to the App Store) arising from the investigation and July 29, 2020 Hearing on "Online Platforms and Market Power: Examining the Dominance of Amazon, Apple, Facebook, and Google" before the U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Antitrust, Commercial, and Administrative Law. | | |
| 56. All documents reflecting Apple's belief and understanding regarding the degree of importance that the App Store (including Mac App Store, TV App Store, and Watch App Store), Accused Functionality, updating or reconfiguring of applications (including operating systems) via or by the Accused Instrumentalities, and being able to offer up-to-date and compatible apps to consumers, have:<br>    a.  To Apple, including, without limitation, to the Apple products ecosystem, to the sales and features set of the products or services offered by Apple, to Apple's standing in the markets in which the Accused Instrumentalities compete, to Apple's market position in the United States | | 1 |

---

[17] E.g., The Apple-Thomson license (Smartflash PX-74) and the Apple-Intertrust license (ContentGuard PX-1055).

[18] See Antitrust Subcommittee Chair Cicilline Statement for Hearing on "Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google," July 29, 2020, at

https://judiciary.house.gov/news/documentsingle.aspx?DocumentID=3199 ("In September 2019, the Chairman and Ranking Members of the Full Committee and the Subcommittee issued sweeping, bipartisan requests for information to the four firms that will testify at today's hearing. Since then, we have received millions of pages of evidence from these firms, as well as documents and submissions from more than 100 market participants. We also conducted hundreds of hours of interviews.").

and worldwide with respect to its competitors (e.g., Google, Microsoft, Samsung, Huawei, Dell, HP, LG, and Android device manufacturers, etc.) in the markets in the United States and worldwide in which they compete, and

   b.  to Apple's customers and their purchasing decisions about Apple's products and services.

The relevant time period for this request is 2007 to present. If the beliefs as to the degree of importance have changed over this time period, please produce documents reflecting those changes in belief.

Documents responsive to this Request include, without limitation, studies and surveys[19] (e.g., App Store Survey; iTunes Store Review; iTunes Store Tracker Survey; App Store Marketing Research; App Store Developers Profiling Research; US App Store Developers Profiling Research; App Store Developers Profiling Research: US; App Store Developer Study; iPad Tracking Study; iPad Buyer Study; iPhone Buyer/Early Buyer Survey, e.g., iPhone 3G Buyer Survey, iPhone 4S Early Buyer Survey; iPhone Owner study; iPhone Buyer Trending (US); iPod Buyer/Early Buyer Survey; Mac Buyer Tracking Study; and other similar studies and surveys related to the App Store, other Accused Instrumentalities, and Apps), raw survey data related to the foregoing surveys, documents reflecting the conclusions Apple has drawn from the survey data, market share and market research reports, competitive analysis, product comparisons, questionnaires, reports (e.g., Mobile

---

[19] Order re Discovery Motions, Apple Inc., v. Samsung Electronics., Ltd., et al., Case No. 5:11-cv-01846-LHK, Dkt. 673 (N.D. Cal. Jan. 27, 2012), UNI-APPLE-00077883 at 903 ("Apple has agreed to produce final survey reports and raw survey data for all customer surveys related to iPhone, iPod Touch, iPad products, market research reports relating to those products, and a wide variety of print, television, and other advertisement media plans, as well as online click counts for the iPhone, iPod Touch, iPad products.").

| | | |
|---|---|---|
| Analytics Report, iPod Market Share and Wave 5 Customer Research Summary), business reviews (e.g., Business Priorities Review), third-party surveys and industry reports (e.g., reports from Analysis Group, Comtech, Nielsen, NPD, comScore, Piper Jaffray, Gartner, Forrester Research, DC, Frost & Sullivan, etc.; Nielsen: Mobile Connected Device Report; Nielsen: Mobile Apps Playbook), business plans, presentations, and executive meeting presentations and agendas (e.g., annual Top 100 executive meeting), conference materials (e.g., WWDC), slides, agendas, meeting minutes, videos, transcripts, summaries, speeches, testimony by Apple employees, and documents, emails, and other evidence that Apple has produced to Congress pertaining to the App Store (e.g., July 29, 2020 Hearing on "Online Platforms and Market Power: Examining the Dominance of Amazon, Apple, Facebook, and Google" before the U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Antitrust, Commercial, and Administrative Law). | | |
| 57. All documents relating to each agreement, offer, settlement, or transaction involving the licensing or purchase of patents between You and Philips (including but not limited to Koninklijke Philips Electronics N.V., Philips North America Corporation, Royal Philips), between You and any entity owned or co-owned by Philips (including but not limited to Intertrust Technologies or Signify Holding), or between You and any entity acting on Philips' behalf, relating to any Philips Technology; U.S. Patent No. 6,467,088 and related patent applications; the Accused Products; the Accused Functionality; any technology that You believe is technologically comparable to the '088 Patent; and any technology that You believe is relevant to a *Georgia-Pacific* analysis or an apportionment analysis in this case. | documents relating to each agreement, offer, settlement, or transaction involving the licensing or purchase of patents between You and Philips Netherlands, Philips U.S., any entity owned or co-owned by Philips (including but not limited to Intertrust Technologies or Signify Holding), or any entity acting on Philips' behalf, relating to any Philips Technology<br><br>documents relating to each agreement, offer, settlement, or transaction involving the licensing or purchase of patents between You and Philips Netherlands, Philips U.S., any entity owned or co-owned by Philips (including but not limited to Intertrust Technologies or Signify Holding), or any entity acting on Philips' behalf, relating to U.S. Patent No. 6,467,088 and related patent applications | 5 |

*Uniloc 2017 v. Apple* (WDTX -532)

| | | |
|---|---|---|
| Documents responsive to this Request include, without limitation, negotiation correspondence, internal analyses of any offers or counter-offers, patent license agreements; patent licensing offers; patent purchase agreements; participation agreement for patent purchase; patent purchase offers; patent assignments; covenants not to sue; standstill agreements; settlement agreements; offers to purchase patents; investment or financing agreements; acquisition agreements; joint-venture agreements; documents identifying or describing the patents that Apple purchased or licensed to or from Philips, any entity owned or co-owned by Philips (including but not limited to Intertrust Technologies or Signify Holding), or any entity acting on Philips' behalf; documents reflecting how much money Apple has paid or received to or from Philips; documents relating to Apple receiving assurances, covenants not-to-sue, standstill agreements, indemnification, or protection from being sued for patent infringement by Philips; and presentations and correspondence related thereto that involve Philips. | documents relating to each agreement, offer, settlement, or transaction involving the licensing or purchase of patents between You and Philips Netherlands, Philips U.S., any entity owned or co-owned by Philips (including but not limited to Intertrust Technologies or Signify Holding), or any entity acting on Philips' behalf, relating to the Accused Products/Accused Functionality<br><br>documents relating to each agreement, offer, settlement, or transaction involving the licensing or purchase of patents between You and Philips Netherlands, Philips U.S., any entity owned or co-owned by Philips (including but not limited to Intertrust Technologies or Signify Holding), or any entity acting on Philips' behalf, relating to any technology that You believe is technologically comparable to the '088 Patent<br><br>documents relating to each agreement, offer, settlement, or transaction involving the licensing or purchase of patents between You and Philips Netherlands, Philips U.S., any entity owned or co-owned by Philips (including but not limited to Intertrust Technologies or Signify Holding), or any entity acting on Philips' behalf, relating to any technology that You believe is relevant to a *Georgia-Pacific* analysis or an apportionment analysis in this case | |
| 58. For each of the Accused Instrumentalities, documents sufficient to show Your U.S. and worldwide number of units sold since 2007 (or, if later than 2007, since the date of first commercialization of each of the Accused Instrumentalities), on a monthly basis (or, only if not available on a monthly basis, per time period for which you keep such information in the ordinary court of Your business) and sufficient to show and describe the | | 1 |

| | | |
|---|---|---|
| components and methodology that are used to calculate the number of units sold.<br><br>To the extent that You produce responsive documents in the form of spreadsheets, please produce them in native file format (*e.g.,* Microsoft Excel format).<br><br>Documents responsive to this Request include, without limitation, spreadsheets and reports generated from Apple's accounting or financial reporting databases or systems showing the requested data and the components and methodology that are used to calculate the number of units sold; internal and external presentations reflecting the requested financial data; and documents and data relied on by Apple's management when presenting the number of units sold during internal meetings, Top 100 executive retreats, and conferences (*e.g.,* WWDC), testimony by Apple employees, and documents, emails, and other evidence that Apple has produced to Congress pertaining to the App Store (*e.g.,* July 29, 2020 Hearing on "Online Platforms and Market Power: Examining the Dominance of Amazon, Apple, Facebook, and Google" before the U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Antitrust, Commercial, andAdministrative Law). | | |